```
_____
                              )
HUASHAN ZHANG, et al.,        )
                              )
          Plaintiffs,         )
                              )
     v.                       )    Case No. 15-cv-995 (EGS)
                              )
UNITED STATES CITIZENSHIP AND )
IMMIGRATION SERVICES, et al., )
                              )
          Defendants.         )
_____)
```

## MEMORANDUM OPINION

## I. Introduction

Almost thirty years ago, Congress established the EB-5 Visa Program ("the Program") to stimulate the economy and create jobs through foreign capital investment. Under the Program, "alien investors" may become eligible to immigrate to the United States in return for investing certain qualifying amounts of capital in a commercial enterprise in the United States. Plaintiffs in this case are individual alien investors whose EB-5 visa petitions were denied by the agency that oversees the Program: the United States Citizenship and Immigration Services ("USCIS"). Plaintiffs allege that their petitions were denied based on USCIS' flawed interpretation of its own regulation. As such, they challenge USCIS' decisions to deny their petitions as arbitrary and capricious in violation of the Administrative

Procedure Act ("APA"), 5 U.S.C. § 706, and the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1153(b)(5). Plaintiffs also claim that USCIS exceeded its statutory authority under the INA by denying their petitions and impermissibly applying its interpretation retroactively. Finally, plaintiffs claim that USCIS engaged in improper rulemaking without notice and comment, also in violation of the APA.

Pending before the Court are: (1) plaintiffs' motion for summary judgment; (2) USCIS' cross-motion for summary judgment; (3) plaintiffs' motion to certify class; and (4) plaintiffs' motion to amend the complaint. Upon consideration of the motions, the responses and replies thereto, the relevant case law, and the entire record herein, the Court **GRANTS IN PART** plaintiffs' motion for summary judgment, **DENIES** USCIS' cross-motion for summary judgment, **GRANTS** plaintiffs' motion to certify class (albeit with a modified class definition), and **DENIES AS MOOT** plaintiffs' motion to amend the complaint. Rather than approve plaintiffs' petitions, however, the Court instead **VACATES** USCIS' denials of the class members' petitions and **REMANDS** the denials to USCIS for reconsideration consistent with this Memorandum Opinion.

## II. Background

### A. Statutory and Regulatory Background

The INA authorizes the United States to issue visas to certain qualified immigrants. *See* Pub. L. No. 101-649 § 121(a) (codified as 8 U.S.C. § 1153(b)(5)(1990)). In 1990, Congress created the EB-5 Visa Program as one of five categories of employment-based immigration preferences to "create new employment for U.S. workers and to infuse new capital into the country." S. Rep. No. 101-55, at 21 (1989). To be eligible for an EB-5 visa, an alien must "invest[]" a certain amount of "capital" in a "commercial enterprise" to "benefit the United States economy and create full-time employment for not fewer than [ten] United States citizens or aliens lawfully admitted . . . ." 8 U.S.C. § 1153(b)(5)(A). An alien investor must generally invest $1,000,000 of "capital" into a new commercial enterprise, but in economically depressed areas, or "targeted employment areas," the required amount of capital may be reduced to $500,000. *Id.* § 1153(b)(5)(C); 8 C.F.R. §204.6(f)(regulating the "required amounts of capital").

In 1991, the Immigration and Naturalization Service ("INS")—USCIS' predecessor agency—promulgated regulations to implement the EB-5 Program. *See* 8 C.F.R. § 204.6 (1991). Among other things, the regulations set forth the criteria necessary to qualify for an EB-5 visa preference. *See id.* To apply, an

alien investor must first submit a Form I-526 immigration petition ("petition" or "I-526 petition"). *Id.* § 204.6(a). The petition must be "accompanied by evidence that the alien has invested or is actively in the process of investing lawfully obtained capital in a new commercial enterprise in the United States which will create full-time positions for not fewer than [ten] qualifying employees." *Id.* § 204.6(j). If the alien investor's I-526 petition is approved, he or she may apply for a visa, which would allow the alien and his or her spouse and children to be admitted to the United States on a conditional basis. *See* 8 U.S.C. § 1202(a); 8 U.S.C. § 1186b(a)(1). If the alien investor fulfills the EB-5 visa requirements within two years, he or she may petition for permanent residence. *Id.* § 1186b(c)(1), (d)(2)(A). The burden of proof to establish eligibility rests with the alien investor. *See* 8 U.S.C. § 1361.

To further delineate the general eligibility criteria, the EB-5 regulations define certain key terms that are otherwise undefined in the INA. 8 C.F.R. § 204.6(e). For example, to "invest" in the new commercial enterprise and create employment, the alien investor must "contribute [a qualifying amount of] capital" to that enterprise. *Id.* "Capital" is defined as "cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien entrepreneur, provided that the alien entrepreneur is personally

and primarily liable and that the assets of the new commercial enterprise . . . are not used to secure any of the indebtedness." *Id.* To qualify as "capital," the invested asset must have been lawfully-obtained: "assets acquired, directly or indirectly, by unlawful means . . . shall not be considered capital." *Id.* The regulations further clarify that a "contribution of capital in exchange for a note . . . obligation, or any other debt arrangement between the alien entrepreneur and the new commercial enterprise does not constitute a contribution of capital." *Id.*

At issue in this case is whether loan proceeds invested as cash constitute "cash," as plaintiffs claim, or "indebtedness," as USCIS claims. On April 22, 2015, USCIS' Immigrant Investor Program Office ("IPO") released remarks stating that invested loan proceeds "may qualify as capital used for EB-5 investments, *provided that* the requirements placed upon indebtedness by 8 C.F.R. § 204.6(e) are satisfied." *See* USCIS, Immigrant Investor Program Office, EB-5 Telephonic Stakeholder Engagement: IPO Deputy Chief's Remarks (Apr. 22, 2015), available at https://www.uscis.gov/sites/default/files/USCIS/Outreach/PED_IPO _Deputy_Chief_Julia_Harrisons_Remarks.pdf (hereinafter referred to as "2015 IPO Remarks")(emphasis in original). The remarks specifically mandated:

When using loan proceeds as EB-5 capital, a
petitioner must demonstrate first that they
are personally and primarily liable for the
indebtedness. That is, they must demonstrate
that they bear primary responsibility under
the loan documents for repaying the debt that
is being used to satisfy the petitioner's
minimum required investment amount.

In addition, the petitioner must demonstrate
that the indebtedness is secured by assets the
petitioner owns and that the value of such
collateral is sufficient to secure the amount
of indebtedness that is being used to satisfy
the petitioner's minimum required investment
amount.

*Id.* at 1. Plaintiffs argue that the 2015 IPO Remarks "announced

a change in [USCIS'] longstanding adjudicatory practice

concerning the classification of loan proceeds." Pls.' Mot. for

Summ. J. ("MSJ"), ECF No. 19 at 21.[1] In so doing, USCIS

"fundamentally reworked the definition of 'capital'" under 8

C.F.R. § 204.6(e). *Id.* at 22. As such, plaintiffs challenge

USCIS' interpretation of the regulation and argue that cash

obtained from third-party loans and invested in an enterprise

qualifies as "cash" within the regulatory definition of

"capital" rather than "indebtedness." *See generally* Pls.' MSJ,

ECF No. 19.

---

[1] When citing electronic filings throughout this Opinion, the
Court cites to the ECF page number, not the page number of the
filed document.

**B. Plaintiffs' I-526 Petitions**

The individually-named plaintiffs are two alien investors who challenge USCIS' decision to deny their petitions on behalf of a putative class of alien investors. Compl., ECF No. 1 ¶ 1; *see* Pls.' Mot. for Class Certification ("Pls.' Class Cert. Mot."), ECF No. 10. As certified below, the plaintiffs represent all Form I-526 petitioners who: (1) invested cash in a new commercial enterprise in an amount sufficient to qualify as an EB-5 investor; (2) obtained some or all of the cash invested in the new commercial enterprise through a loan; (3) filed an I-526 petition based on that investment;[2] and (4) received or will receive a denial of their I-526 petition *solely* on the ground that the loan used to obtain the invested cash fails the collateralization test described in the USCIS 2015 IPO Remarks announcement.

Named plaintiff Huashan Zhang is a citizen of the People's Republic of China seeking to immigrate to the United States with his wife and children. Zhang Admin. R. ("Zhang A.R."), ECF Nos. 27-2, 27-3, 27-4. On December 23, 2013, Mr. Zhang filed an I-526

---

[2] Plaintiffs' proposed class definition seeks to include petitioners who "filed an I-526 petition prior to April 22, 2015." Because the Court need not resolve the retroactivity claim, as USCIS' interpretation is contrary to the regulation and violative of the APA, this date limitation serves no purpose. The Court has therefore modified the class definition accordingly. *See infra* Sec. III.B.7.

petition claiming that he fulfilled the minimum capital requirement by investing $500,000 in cash in a new commercial enterprise in Las Vegas, Nevada. Zhang A.R., ECF No. 27-2 at 4-26. Mr. Zhang obtained the invested $500,000 via a loan from Shaanxi Northwest Textile and Dyeing Company ("Shaanxi Northwest"). *Id*. at 22. Mr. Zhang owns 99 percent of Shaanxi Northwest. *Id.* The loan was secured by his undistributed profits held by the company, which greatly exceeded $500,000. *Id.* at 22-25; Zhang A.R., ECF No. 27-3 at 4 (loan agreement between Shaanxi Northwest and Mr. Zhang). Shaanxi Northwest wired the loan proceeds to Mr. Zhang's personal account. Zhang A.R., ECF No. 27-2 at 20, 25-26. Mr. Zhang then converted the loan proceeds into U.S. currency and wired the funds into an escrow account earmarked for the new commercial enterprise. *Id.*

On May 28, 2015, USCIS denied Mr. Zhang's I-526 petition, asserting that Mr. Zhang did not place the required amount of capital at risk for the purpose of generating a return on his investment. Zhang A.R., ECF No. 27-4 at 175-85. Interpreting the invested cash loan proceeds as "indebtedness," USCIS determined that Mr. Zhang's investment did not qualify as "capital" because the Shaanxi Northwest loan was not secured by his personal assets. *Id*. at 179-80. Instead, Mr. Zhang's loan was secured solely by his undistributed profits, which belonged to Shaanxi Northwest until distributed. *Id.* Because Mr. Zhang had not met

the requirements for "indebtedness," USCIS concluded that he "had not placed the required amount of capital at risk for the purposes of generating a return on his investment *as the shareholder loan proceeds do not constitute qualifying capital pursuant to 8 C.F.R. § 204.6(e)*." *Id.* at 180 (emphasis added).

Second named plaintiff Mayasuki Hagiwara is a Japanese citizen seeking to immigrate to the United States with his wife though the EB-5 Program. Hagiwara Admin. R. ("Hagiwara A.R."), ECF No. 27-1. On March 17, 2014, Mr. Hagiwara filed his I-526 petition with USCIS, asserting eligibility based on his $500,000 cash investment in a new commercial enterprise in Tonopah, Nevada. *Id.* at 4-14. Mr. Hagiwara obtained the invested $500,000 via a personal loan from J. Kodama, Inc., a Hawaiian corporation of which Mr. Hagiwara is a majority shareholder. *Id.* at 10. The loan was secured by Mr. Hagiwara's stock holdings in the corporation. *Id.* at 254. The funds were wired and "released" to the new commercial enterprise "for deployment" in accordance with its business plan. *Id.* at 11.

Employing the same general reasoning as in Mr. Zhang's case, USCIS denied Mr. Hagiwara's I-526 petition on March 27, 2015. *Id.* at 392-95. USCIS found that Mr. Hagiwara's investment did not qualify as "capital" pursuant to 8 C.F.R. § 204.6(e) because he invested cash loan proceeds that were not secured by personal assets. *Id.* at 394-95. Although Mr. Hagiwara protested

that he had invested "cash" and not "indebtedness," USCIS reasoned that investing loan proceeds is tantamount to investing indebtedness, which must be secured by the petitioner's personal assets under the regulation. *Id.* at 395. USCIS concluded that the regulation "clearly precluded" characterizing "all unsecured third-party loans" as contributions of cash and denied his petition. *Id.*

### C. Procedural History

Plaintiffs filed their complaint on June 23, 2015 and all pending motions were ripe for review by June 2016. However, the Court stayed the case in March 2017 when the parties indicated that they were amenable to settlement assistance from the Court's mediation program. Mediation efforts failed, and the pending motions are ready for adjudication.

## III. Analysis

Pending before the Court are: (1) plaintiffs' motion for summary judgment; (2) USCIS' cross-motion for summary judgment; (3) plaintiffs' motion to certify class; and (4) plaintiffs' motion to amend the complaint. The Court first considers the cross-motions for summary judgment. The Court analyzes two of plaintiffs' four claims: (1) that USCIS' interpretation of 8 C.F.R. § 204.6, the EB-5 regulation, is erroneous because it contravenes the regulation's plain meaning; and (2) that USCIS violated the APA because its interpretation is a legislative

rule promulgated without notice and comment. Because the Court agrees with plaintiffs on these two claims, it need not assess plaintiffs' two other claims: (1) that USCIS' application of its interpretation has been impermissibly applied retroactively;[3] and (2) that USCIS' interpretation is *ultra vires* and exceeds its statutory authority conferred by the INA. The Court then considers plaintiffs' motion to certify class. Because the Court grants in part plaintiffs' motion for summary judgment and motion to certify class, it need not consider the pending motion to amend the complaint.

## A. Cross-Motions for Summary Judgment

Though each of plaintiffs' four claims against USCIS is disputed, the essential issue is whether lawfully-obtained, loan proceeds invested in the enterprise as cash are properly characterized as "cash" or as "indebtedness" pursuant to 8 C.F.R. § 204.6(e). Because the Court agrees that USCIS' interpretation of its regulation is plainly erroneous, denying plaintiffs' petitions pursuant to that interpretation was arbitrary and capricious. Moreover, the Court finds that USCIS'

---

[3] Plaintiffs agree that the retroactivity analysis need not be reached if the Court finds that USCIS' interpretation is arbitrary and capricious. *See* Pls.' MSJ, ECF No. 19 at 51 ("Indeed, the retroactivity analysis starts with the assumption that the policy or interpretation at issue is *not* arbitrary and capricious. If a rule is arbitrary and capricious, the issue of retroactivity is moot because the rule cannot be applied prospectively, much less retroactively.").

interpretation effectively amends a regulation without notice and comment, violating the APA.

## 1. USCIS' Interpretation of 8 C.F.R. § 204.6(e) is Plainly Erroneous

### a. The Parties' Arguments

Plaintiffs argue that USCIS' interpretation[4]—that third-party loan proceeds invested as cash in a commercial enterprise are properly characterized as "indebtedness" within the meaning of "capital"—is plainly erroneous. Plaintiffs contend that USCIS' interpretation, as articulated in the 2015 IPO Remarks, "ignores the plain language, structure, history, and purpose of the regulation on which it purports to be based." Pls.' MSJ, ECF No. 19 at 30. They argue that the plain meaning of the word "cash" encompasses cash loan proceeds and the definition of "capital" in the regulation mandates that lawfully-obtained "cash" necessarily qualifies as "capital" without further collateral prerequisites. *Id.* at 31-33 ("[C]ash obtained from a loan is no less 'cash' than cash obtained from any other source."). Because plaintiffs invested the requisite amount of

---

[4] Plaintiffs refer to USCIS' interpretation of the regulation as the "collateralization rule." *See, e.g.*, Pls.' MSJ, ECF No. 19. While the Court finds that USCIS' interpretation was in fact a legislative rule subject to the APA's notice and comment procedures, the Court will not refer to it as a "rule" and will instead use the term "interpretation" for consistency and clarity.

lawfully-obtained cash, they argue that they satisfactorily invested "capital." *Id.* at 30-35.

Plaintiffs also argue that cash loan proceeds cannot be characterized as "indebtedness," the only form of "capital" that must be secured by assets owned by the alien investor. *Id.* at 33-34. Because indebtedness means the "condition of being indebted," plaintiffs contend that investing indebtedness is only "an asset of value to *the new commercial* enterprise" when "it describes an investor's obligation to make monetary payments *to the enterprise* at a later date." *Id.* at 33 (emphasis added). Thus, "indebtedness" is not a debt to an unrelated third-party lender, but rather a debt to the enterprise itself. *Id.* at 33-35. Plaintiffs also argue that USCIS' interpretation is inconsistent with the history and structure of the regulation and the INA. *See id.* at 36-37. Finally, plaintiffs argue that USCIS did not provide a rational explanation for its interpretation and that USCIS ignored the unfair effect of applying its interpretation retroactively to plaintiffs' cases.[5] *Id.* at 37-38.

USCIS responds that its decision to deny plaintiffs' petitions was "reasonable." Defs.' MSJ & Opp'n, ECF No. 22 at

---

[5] The Court need not reach these additional arguments because it finds that USCIS' interpretation was contrary to the plain meaning of its regulation.

13. According to USCIS, its decisions were based on its "longstanding interpretation of its regulation" that cash loan proceeds invested in an enterprise are properly characterized as "indebtedness," and thus must be personally collateralized to qualify as "capital." *Id.* at 24. Therefore, to qualify, a petition must establish that the alien investor "secured the loan using assets for which they own and are personally and primarily liable." *Id.*

USCIS also argues that its interpretation is not erroneous because it "aligns with the foundational requirements that the alien investor must demonstrate that he is placing capital he owns directly at risk." *Id.* at 25 (citing 8 C.F.R. § 204.6(j)(2),(3)). According to USCIS, an alien investor must provide different evidence to show that his or her investment is "at risk" depending on the source of that investment. *See id.* at 26. Because plaintiffs obtained their capital from loan proceeds, USCIS argues that they must provide evidence of "any loan . . . agreement . . . which is secured by assets of the petitioner" to show that the investment is at risk. *Id.* (quoting 8 C.F.R. § 204.6(j)(2)(v)). USCIS further contends that if it simply reduced all financial arrangements to "their tangible end product – 'cash,'" as plaintiffs argue, the agency would be unable to investigate an investor's ownership and source of funds. *Id.* at 27.

Finally, USCIS argues that because the agency is interpreting its own regulation, it is entitled to "even greater deference than the *Chevron* standard," which plaintiffs have failed to overcome. *Id.* at 24 (quoting *Consarc Corp. v. U.S. Treas. Dep't*, 71 F.3d 909, 915 (D.C. Cir. 1995)).

### b. Standard of Review

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review," which "requires a reviewing court to 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *UPMC v. Sebelius*, 793 F. Supp. 2d 62, 67 (D.D.C. 2011)(quoting 5 U.S.C. § 706(2)(A)). However, due to the limited role of a court in reviewing the administrative record, the typical summary judgment standards set forth in Federal Rule of Civil Procedure 56(c) are not applicable. *Stuttering Found. Of Am. V. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (internal citation omitted). Rather, "[u]nder the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to

make the decision it did.'" *Id*. (quoting *Occidental Eng'g Co. v. INS*, 7523 F.2d 766, 769-70 (9th Cir. 1985)). A reviewing court will "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Ludlow v. Mabus*, 793 F. Supp. 2d 352, 354 (D.D.C. 2001) (quoting 5 U.S.C. § 706(2)(A)); *see also Tenet Healthsystems Healthcorp. v. Thompson*, 254 F.3d 238, 243 (D.C. Cir. 2001).

The arbitrary and capricious standard of review is "narrow," and "a court is not to substitute its judgment for that of the agency." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009)(citations and quotations omitted). An agency rule will be found to be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

A reviewing court "must give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)(citations

omitted). However, such deference "is warranted *only* when the language of the regulation is ambiguous." *Christensen v. Harris County*, 529 U.S. 576, 588 (2000)(emphasis added). If the regulation is ambiguous, the agency's interpretation must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ.*, 512 U.S. at 512 (citations and quotations omitted). However, if an "'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation,'" the Court need not defer to the agency's interpretation. *Id.* (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

### c. USCIS' Interpretation is Plainly Erroneous

The Court first considers whether USCIS' interpretation—that loan proceeds invested as cash are properly characterized as indebtedness—is inconsistent with the plain meaning of the regulation. If the regulation is clear that cash loan proceeds are invested as "cash," USCIS' interpretation of 8 C.F.R. § 204.6(e), as set forth in the 2015 IPO Remarks, is "plainly erroneous or inconsistent with the regulation" itself. *Auer v. Robbins*, 519 U.S. 452, 461 (1997). As such, USCIS' decisions to deny plaintiffs' petitions based solely on that interpretation would also be erroneous. *See id.; see also* 2015 IPO Remarks at 1; *See* Zhang A.R., ECF No. 27-4 at 179-80 ("[P]etitioner has not

17

demonstrated that he has placed the required amount of capital at risk . . . as the shareholder loan proceeds do not constitute qualifying capital pursuant to 8 C.F.R. § 204.6(e)."); Hagiwara A.R., ECF No. 27-1 at 394-96 ("Petitioner has failed to establish by a preponderance of the evidence that his unsecured loan . . . meets the regulatory definition of capital.").

As discussed below, the Court first finds that the regulation is unambiguous and USCIS' interpretation contravenes its plain meaning. The Court also concludes that USCIS' interpretation is inconsistent with its own precedent and the context and history of the EB-5 Program. As such, the Court concludes that USCIS' decisions to deny plaintiffs' petitions were arbitrary and capricious.

### i. The EB-5 Regulation is Unambiguous

The INA mandates that visas must be made available when an alien "has invested . . . capital" in a specified amount to "benefit the United States economy and create full-time employment for not fewer than [ten] United States citizens . . . ." 8 U.S.C. § 1153(b)(5). Congress did not define "invest" or "capital" in the statute. *See id.* In 1991, USCIS' predecessor agency, the INS, published regulations defining both:

> *Invest* means to *contribute capital.*[6]

---
[6] The definition of "invest" further provides that "[a] contribution of capital in exchange for a note, bond,

> *Capital* means *cash*, equipment, inventory,
> other tangible property, cash equivalents, *and*
> *indebtedness secured by assets owned by the*
> *alien entrepreneur*, provided that the alien
> entrepreneur is personally and primarily
> liable and that the assets of the new
> commercial enterprise upon which the petition
> is based are not used to secure any of the
> indebtedness. All capital shall be valued at
> fair market value in United States dollars.
> Assets acquired, directly or indirectly, by
> unlawful means (such as criminal activities)
> shall not be considered capital for the
> purposes of section 203(b)(5) of the Act.

8 C.F.R. § 204.6(e)(emphasis added and alphabetical order
reversed).

"Capital" is therefore the type of asset that is invested
or "contributed" to the commercial enterprise for the purpose of
creating employment. *See id.*; 8 U.S.C. § 1153(b)(5). To be
considered "capital," an invested asset must meet only two
requirements: (1) it must be contributed in one of the six
acceptable forms; and (2) it must be lawfully acquired. *See* 8
C.F.R. § 204.6(e). The definition approves six forms of
"capital": "[1] cash, [2] equipment, [3] inventory, [4] other
tangible property, [5] cash equivalents, and [6] indebtedness
[so long as the invested indebtedness is secured by assets owned

---

convertible debt, obligation, or any other debt arrangement
between the alien entrepreneur and the new commercial enterprise
does not constitute a contribution of capital for the purposes
of this part." 8 C.F.R. § 204.6(e). USCIS has not suggested that
plaintiffs entered into a "debt arrangement" with the enterprise
or that the enterprise guaranteed repayment of the invested
capital. *See generally* A.R., ECF No. 27.

by the investor, such that the investor is personally and primarily liable, and that the enterprise is not used to secure the debt]." *Id.*

The regulation does not define "cash" or "indebtedness" within the definition of "capital." However, the text plainly directs the agency to view the transaction between the alien investor and the enterprise to identify the particular asset actually "contributed" to the enterprise. *Id.* ("invest means to contribute capital"); 8 U.S.C. § 1153(b)(5)(visas shall be made available to aliens who invest capital in an enterprise to benefit the economy and create employment). USCIS must therefore determine whether that contributed asset meets the definition of "capital," *i.e.*, whether it was: (1) contributed in an acceptable form; and (2) lawfully acquired. *See id.* In plaintiffs' cases, it is undisputed that the assets actually contributed to the enterprises were cash loan proceeds. *See* Hagiwara A.R., ECF No. 27-1 at 394-95; Zhang A.R., ECF No. 27-4 at 179-80. The Court must therefore determine whether the regulation is unambiguous as to the central question: whether cash loan proceeds are invested as "cash," as plaintiffs argue, or as "indebtedness," as USCIS contends.

To resolve this question, the Court looks to the ordinary meaning of cash. "When a word is not defined by statute, [the court] normally construe[s] it in accord with its ordinary or

natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). The plain and ordinary meaning of "cash" compels the conclusion that loan proceeds invested in the form of cash must be characterized as "cash" within the unambiguous definition of "capital" set forth in the regulation.

First, the plain and ordinary meaning of "cash" is "money or its equivalent" such as "currency or coins." *Cash*, Black's Law Dictionary (10th ed. 2014); *see Smith*, 508 U.S. at 228-29 (determining the ordinary meaning an undefined statutory term by turning to the Black's Law Dictionary definition). Accordingly, an investment was made in "cash" if the investor transferred "money or its equivalent" to the investee. *Cash*, Black's Law Dictionary (10th ed. 2014). How the investor came up with the cash to invest—whether through a loan, a bank account, or any other source—does not affect whether the investment itself is cash. Put differently, that the cash was obtained from proceeds from a third-party loan does not make it anything other than cash. *See Davis v. Connecticut Cmty. Bank*, 937 F. Supp. 2d 217, 224-25 (D. Conn. 2013) ("cash is an inherently fungible good"); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 195-96 (3d Cir. 1990) ("[I]f a debtor with $100,000 cash in its general coffers owes $10,000 to someone, there is no meaningful distinction among which of those dollars is actually paid to

satisfy the debt."). Nothing in the ordinary meaning of the word "cash" suggests that it excludes cash proceeds from a loan.

Cash loan proceeds, or the cash "received upon selling, exchanging, collecting, or otherwise disposing of collateral," *Proceeds*, Black's Law Dictionary (10th ed. 2014), are not transformed from cash into another asset when invested. Indeed, cash loan proceeds are commonly characterized as "cash," consistent with the word's ordinary meaning. *See* Pls.' MSJ, ECF No. 19 at 32 n.11 (pointing to "dozens of federal judicial decisions . . . refer[ring] to the 'cash' proceeds of a loan" and citing *Drew v. Ocwen Loan Servicing, LLC*, 2015 WL 5637569, at *2 (M.D. Fla. Sept. 17, 2015), among other authority). Moreover, USCIS itself has described the assets a borrower receives from a loan as "cash proceeds." *See In re: Petitioner [Redacted]*, 2012 WL 8524530, at *4 (AAO Aug. 14, 2012) (unpub.)(analyzing an employment-based nonimmigrant visa petition for a religious worker).[7]

The "words of statutes or regulations must be given their 'ordinary, contemporary common meaning.'" *FTC v. Tarriff*, 584

---

[7] USCIS argues that these cited cases are "inapposite because none of them address 'cash' with regards to the EB-5 program definition of 'capital' found at 8 C.F.E. § 204.6(e)." Defs.' MSJ & Opp'n, ECF No. 22 at 25 n.10. The Court disagrees. As discussed, the definition of cash is undefined in the EB-5 regulation and, as such, the Court must turn to the term's ordinary, common meaning. Plaintiffs' cited cases reflect the common meaning of the word "cash."

F.3d 1088, 1090 (D.C. Cir. 2009) (quoting *Williams v. Taylor*, 529 U.S. 420, 431 (2000))(examining the unambiguous common meaning of the word "shall"). Because lawfully-acquired cash unambiguously qualifies as "capital" under the regulation, USCIS' interpretation that cash loan proceeds do not qualify as a "cash" investment is untenable. *See Ass'n of Private Sector Colleges and Univs. V. Duncan*, 681 F.3d 427, 450 (D.C. Cir. 2012)(holding that an agency may not "reinterpret[] [a] regulation in a way the text does not support"). Therefore, its denials of plaintiffs' petitions on that basis was erroneous as contrary to the language of the regulation. 8 C.F.R. § 204.6(e)("Capital means cash").

USCIS neither offers its own definition of "cash," nor explains why cash proceeds from third-party loans are not invested as "cash." *See generally* Defs.' MSJ & Opp'n, ECF No. 22; Defs.' Reply, ECF No. 26. Instead, it emphasizes the deference it is purportedly owed and concludes that its interpretation is not clearly erroneous. *See* Defs.' MSJ & Opp'n, ECF No. 22 at 24. Indeed, without providing any support that the provision is ambiguous, USCIS repeatedly asserts that the Court should defer to its interpretation of its own regulation because it is owed "an even greater degree of deference than the *Chevron* standard, and must prevail unless plainly inconsistent with the regulation." *Id.* at 24-27 (citing *Auer*, 519 U.S. at 461;

*Consarc*, 71 F.3d at 915). However, such deference is only warranted if the regulation at issue is ambiguous. *Christensen*, 529 U.S. at 588 ("But *Auer* deference is warranted only when the language of the regulation is ambiguous."); *Thomas Jefferson Univ.*, 512 U.S. at 512 ("[W]e must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.")(internal citations omitted). The Court concludes that the regulation's plain meaning is clear. As such, deference to USCIS is unwarranted.

Moreover, USCIS' interpretation is not one of several "permissible constructions," as it suggests. Defs.' Reply, ECF No. 26 at 13 (citing *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398-99 (1996) (analyzing an agency's interpretation of an ambiguous statute)). Instead, USCIS is "seeking to overcome the regulation's obvious meaning." *Christensen*, 529 U.S. at 588; *see also In re Sealed Case*, 237 F.3d 657, 667 (D.C. Cir. 2001)("In this case, the . . . regulation at issue [is] unambiguous and directly address[es] the issue presented in this case. The[] plain meaning therefore controls our decision."). For example, by attempting to regulate how an alien investor acquires invested cash—beyond ensuring that the cash was legally acquired and that the cash was not derived from the enterprise itself—

USCIS adds an additional requirement to the regulatory definition of "capital" not found within the text. *See* 8 C.F.R. § 204.6(e). To illustrate, under USCIS' interpretation, "capital" does not include lawfully-acquired cash, but lawfully-acquired cash not derived from a third-party loan. *See* 2015 IPO Remarks; *see also* Zhang A.R., ECF No. 27-4 at 179-80 (determining that a lawfully-acquired, cash investment did not qualify as capital based on Mr. Zhang's method of obtaining it); Hagiwara A.R., ECF No. 27-1 at 395-96 (same). As previously discussed, the regulation sets forth only two conditions for a cash asset to qualify as capital: (1) it was invested as cash and (2) it was lawfully-acquired. *See* 8 C.F.R. § 204.6(e). The fact that the regulation includes these two conditions necessarily implies that no other conditions are necessary for a cash investment to constitute capital. *District of Columbia Fin. Responsibility & Mgmt. Auth. v. Concerned Senior Citizens of the Roosevelt Tenant Ass'n., Inc.*, 129 F. Supp. 2d 13, 16 (D.D.C. 2000) ("One of the most firmly established canons of interpretation is *expressio unius est exclusio alterios,* that is, the expression of one is the exclusion of the other.") (citing *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) ("[a]ffirmative words are often, in their operation, negative of other objects than those affirmed")).

In so doing, USCIS impermissibly creates "*de facto* another regulation." *Christensen*, 529 U.S. at 588. In *Christensen v. Harris County*, the Supreme Court declined to defer to the agency's interpretation of its regulation in part because the agency sought to add an additional requirement not found within the regulation, contrary to the regulation's "obvious meaning." *Id.*; *see also Appalachian Power Co. v. Envtl. Protection Agency*, 249 F.3d 1032, 1048 (D.C. Cir. 2001)("The Supreme Court recently held that we should not defer to an agency's interpretation imputing a limiting provision to a rule that is silent on the subject . . . [in] cases in which the agency's interpretation postdated its adoption of the rule and was not itself subject to the rigors of notice and comment.") (citing *Christensen*, 529 U.S. at 588)). So here too. Had USCIS intended to further regulate lawfully-acquired, loan proceeds invested in the enterprise as "cash," it could have explicitly done so or amended the regulation.[8] As drafted, however, there is no textual basis for USCIS' interpretation. *See* 8 C.F.R. § 204.6.

USCIS also argues that its definition is compelled by other sections of the regulation and by its own binding precedent. As

---

[8] Indeed, USCIS has recently proposed changes to 8 C.F.R. § 204.6 to increase the required capital contribution, in part because the EB-5 Program is "oversubscribed." *See* Proposed Rule EB-5 Immigrant Investor Program Modernization, 82 Fed. Red. 4738 (Jan. 13, 2017).

will be explained in further detail below, the Court disagrees. *See infra* Secs. III.A.1.c.ii,iii. Ultimately, the Court concludes that the regulation is clear: an investor indeed invests "capital" by contributing lawfully-acquired cash loan proceeds to an enterprise. USCIS' interpretation that "capital" does not include lawfully-acquired "cash," but rather only includes lawfully-acquired cash not derived from third-party loans contravenes the regulation's plain meaning.

### ii. USCIS' Interpretation is Not Supported by the Text

USCIS argues that its interpretation is supported by the regulation's text in three ways. First, it argues that loan proceeds are invested as "indebtedness" pursuant to the regulation's definitional section, 8 C.F.R. § 204.6(e). *See* Defs.' MSJ & Opp'n, ECF No. 22 at 24-27. Next, it argues that its interpretation "aligns with the foundational requirements that the alien investor must demonstrate that he is placing capital he owns directly at risk" pursuant to 8 C.F.R. § 204.6(j)(2). *Id.* at 25. Third, it argues that its interpretation is necessary to ensure that the alien investor derived his or her invested funds from a lawful source pursuant to 8 C.F.R. § 204.6(j)(3). *Id.* at 25, 27. The Court will address each argument in turn.

## (1) Cash Loan Proceeds are Not Invested as Indebtedness

In arguing that cash loan proceeds are invested as indebtedness, USCIS suggests that it must examine the manner in which the investor *acquired* the invested asset (beyond ensuring the asset was lawfully-acquired, which it is undisputedly obligated to do) pursuant to 8 C.F.R. § 204.6(j)(3). *See generally* Defs.' MSJ & Opp'n, ECF No. 22. As discussed, USCIS neither offers its own interpretation of the key terms, nor explains why cash proceeds are invested as "indebtedness." *See generally id.*; Defs.' Reply, ECF No. 26.

The regulation, 8 C.F.R. § 204.6, does not define the term "indebtedness." Instead, the regulation offers it as an alternative asset to cash, qualifying as "capital" *only* if the invested indebtedness is secured by assets that the alien investor owns, such that the investor is personally and primarily liable for the debt. 8 C.F.R. § 204.6(e). The assets of the enterprise may also not be used to secure any of the indebtedness. *Id.* Because indebtedness is undefined in the regulation, it must be construed "in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (citing *Smith*, 508 U.S. at 228). To that end, "indebtedness" means "the quality, state, or condition of owing money." *Indebtedness*, Black's Law Dictionary (10th ed. 2014).

Of course, an individual who takes out a loan is indebted in a generic sense: the borrower is indebted to the lender to whom he or she owes money. However, as discussed, the regulation requires USCIS to consider the transaction between the alien investor and the enterprise. In so doing, USCIS must identify the asset actually *contributed* to the enterprise. *See* 8 C.F.R. § 204.6(e) ("invest means to contribute capital [to the enterprise]"). Here, it is clear that the alien investor is not contributing *debt* to the enterprise, but is contributing *cash*. *See* Zhang A.R., ECF No. 27-2 at 20, 25-26; Hagiwara A.R., ECF No. 27-1 at 11. The enterprise is free to deploy that invested cash to create jobs for Americans. Indeed, an investor can only *contribute* indebtedness if the investor's "state of being indebted" is to the enterprise itself. *See* 8 C.F.R. § 204.6(e). In that sense, the indebtedness is an asset of value because the investor is obligated to make payments to the enterprise at a later date.

This reading is confirmed by USCIS' longstanding, binding precedent. While the Court will further examine the precedent, *see infra* Sec. III.A.1.c.iii, USCIS published four "precedent decisions," which are binding on the agency. See *Matter of Ho*, 22 I. & N. Dec. 206 (BIA 1998); *Matter of Hsiung*, 22 I. & N. Dec. 201 (BIA 1998); *Matter of Izummi*, 22 I. & N. Dec. 169 (BIA 1998); *Matter of Soffici*, 22 I. & N. Dec. 158 (BIA 1998). In

*Matter of Izummi*, USCIS considered an arrangement whereby an investor promised to pay an enterprise in the future via a promissory note. USCIS confirmed that such an arrangement can constitutes investing "capital" pursuant to the regulation so long as the alien investor was personally and primarily liable for the indebtedness to the enterprise. *See* 22 I. & N. Dec. 169 (BIA 1998)(finding that the alien investor invested indebtedness by promising to pay the enterprise in the future); *see also Matter of Hsiung*, 22 I. & N. Dec. 201, 201 (BIA 1998) ("A promissory note secured by assets owned by a petitioner can constitute capital under 8 C.F.R. § 204.6(e) if: the assets are specifically identified as securing the note; the security interests in the note are perfected in the jurisdiction in which the assets are located; and the assets are fully amenable to seizure by a U.S. note holder."). Under that arrangement, the need for personal collateralization is entirely clear: when the asset actually contributed to the enterprise is merely a promise, the enterprise requires security. *See Hsiung*, 22 I. & N. Dec. at 202 n.1 ("merely 'identifying' assets as securing a loan, without perfecting the security interest, is not meaningful since the note holder cannot be assured that the identified assets will remain available for seizure in the event of default."). As here, however, when the enterprise receives

30

lawfully-acquired cash it can readily deploy, no security

interest is necessary.[9]

Finally, the Court's conclusion is also supported by a

USCIS policy memorandum released in May 2013. *See* USCIS, *EB-5*

*Adjudications Policy* (PM-602-0083)(May 30, 2013), available at

https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2

013/May/EB-5_Adjudications_PM_Approved_as_final_5-30-13.pdf. In

clarifying the definition of capital, USCIS stated: "the

definition of 'capital' is sufficiently broad that it includes

not only such things of value as cash, equipment, and other

tangible property, but it can also include the immigrant

investor's promise to pay (a promissory note)." *Id.* at 3. USCIS

substitutes a "promise to pay" for the word in the regulation:

"indebtedness." USCIS goes on to clarify that a "promise to pay"

may only be considered "capital" if it meets the indebtedness

requirements: "[capital] include[s] the immigrant investor's

---

[9] USCIS does not argue that the plaintiffs used or will use the enterprise's assets as collateral for the third-party loans. *See generally* Defs.' MSJ & Opp'n, ECF No. 22. However, assuming this is a concern, USCIS could easily deny a petition based on an investment of cash loan proceeds if the underlying loan was secured by the enterprise. *See* 8 C.F.R. § 204.6(j)(2). As explained more thoroughly below, USCIS must ensure that the capital invested was "actually committed" to the enterprise. *See id.; infra* Sec. III.A.1.c.ii.(2). If an alien investor invested cash in the enterprise that could be seized by a lending third-party, the investor has not truly "committed" the cash to the enterprise. This is not to say that a loan must be secured by the alien investor's assets, rather that the loan must *not* be secured by the enterprise's assets.

31

promise to pay (a promissory note), as long as the promise is secured by assets the immigrant investor owns, the immigrant investor is liable for the debt, and the assets of the immigrant investor do not for this purpose include assets of the company in which the immigrant is investing." *Id.*

### (2) The "At Risk" Provision Does Not Support USCIS' Interpretation

USCIS argues that its interpretation that cash loan proceeds are invested as indebtedness is necessary to ensure that alien investors comply with the regulation's "foundational requirements that the alien investor . . . is placing capital he owns directly at risk." Defs.' MSJ & Opp'n, ECF No. 22 at 25 (citing 8 C.F.R. § 204.6(j)(2),(3)); *see also* 2015 IPO Remarks. In so arguing, however, USCIS conflates two separate regulatory requirements.

In addition to establishing that the alien investor invested a qualifying amount of "capital" in the new commercial enterprise for the purpose of creating employment, the investor must also demonstrate that the capital was put "at risk" "for the purpose of generating a return on the capital." *See* 8 C.F.R. § 204.6(j)(2). The regulation is clear that this requirement ensures that the capital has actually been contributed, or "invest[ed]," in the enterprise. *See id*. Specifically, the provision requires that the investor show the "actual commitment

of the required amount of capital." *Id.*; *see also Matter of Izummi*, 22 I. & N. Dec. 169, 170-71, 186 (BIA 1998)(finding that the alien investor had not placed his investment "at risk" because the enterprise had given him the right to sell his partnership interest back for the original price: "for the alien's money truly to be at risk, the alien cannot enter into a partnership knowing that he already has a willing buyer in a certain number of years, nor can be assured that he will receive a certain price. Otherwise, the arrangement is nothing more than a loan [to the enterprise]."); *Matter of Ho*, 22 I. & N. Dec. 206, 209-10 (BIA 1998)(finding the alien investor had not placed his investment at risk because he maintained control over the invested money); *Chang v. USCIS*, 289 F. Supp. 3d 177, 180, 187-88 (D.D.C. 2018)(finding USCIS' denial arbitrary and capricious because the alien investors had placed their money at risk; there was "no security that [the investors] would ever see [their] money again"); *Doe v. USCIS*, 239 F. Supp. 3d 297, 306 (D.D.C. 2017)(finding USCIS' denial arbitrary and capricious because the alien investors had placed their money at risk; they "were not guaranteed to receive *any* of their capital contributions back, let alone make any return on their investments").

The "at risk" provision lists the types of documentation that may establish the alien investor's "actual commitment" of

capital. The list includes, but is not limited to, bank
statements showing that cash has been deposited into the
enterprise's bank account, assets purchased by the alien
investor for use by the enterprise, and evidence of any "loan
agreement" or "other evidence of borrowing, which is secured by
assets of the petitioner, other than those of the new commercial
enterprise, for which the petitioner is personally or primarily
liable." *Id.* § 204.6(j)(2)(i-v).

USCIS relies on these examples to argue that its
"interpretation of its regulation is not plainly erroneous
because the evidentiary requirements necessary to demonstrate
owned capital is 'at risk' are different based on how the
capital is obtained." Defs.' MSJ & Opp'n, ECF No. 22 at 26
(citing 8 C.F.R. § 204.6(j)(2)(v)). Because plaintiffs obtained
their capital from third-party loan proceeds, USCIS argues that
they must provide evidence of any loan agreement which is
secured by assets of the petitioner for which the petitioner is
personally and primarily liable. *Id.*

However, USCIS' argument fails because it contradicts the
definition of capital, which unambiguously includes lawfully-
acquired cash, *see* 8 C.F.R. § 204.6(e), and "the definition of a
term in the definitional section of a statute controls the
construction of that term," *United States v. E-Gold, Ltd.*, 550
F. Supp. 2d 82, 91 (D.D.C. 2008) (quotations and citations

34

omitted); *see also Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 237 (D.D.C. 2014)(finding that the definitional section "controls"). Indeed, the "at risk" requirement does not modify the definition of "capital" in the definition subsection. Instead, the non-exhaustive list of satisfactory evidence is included to provide examples of "evidence" that an alien investor may use to "show actual commitment of required capital." 8 C.F.R. § 204.6(j)(2). As plaintiffs' correctly point out, the "at risk" requirement "says what an investor must *do* with 'capital' (*i.e.* place it 'at risk' for the purpose of generating a return)—not what 'capital' is," which is the issue at hand here. Pls.' Reply, ECF No. 24 at 22.

As such, the "at risk" provision does not provide USCIS with a basis for its interpretation. Whether an alien investor obtained the lawfully-acquired cash from a third-party loan is irrelevant to whether that cash was actually committed to the enterprise for the purpose of generating a return.

> ### (3) USCIS Retains the Authority to Ensure That Invested Assets are Derived From Lawful Sources

USCIS also argues that classifying loan proceeds as cash would "effectively cut off" the agency's ability to look into the petitioner's "source of investment funds." Defs.' MSJ & Opp'n, ECF No. 22 at 27. Not so. Regardless of the form of capital invested, an asset will not qualify as "capital" if

"acquired, directly or indirectly, by unlawful means (such as criminal activities)." 8 C.F.R. § 204.6(e). In that sense, *no asset*—whether cash, indebtedness, or otherwise—will satisfy the definitional requirement if obtained directly or indirectly by unlawful means. *See id.*

The Court's decision does not impact USCIS' ability to investigate whether the petitioner's invested cash loan proceeds were lawfully-acquired. As USCIS articulated in its 2015 IPO Remarks, the agency may determine whether the loan proceeds were obtained unlawfully or if the cash actually invested did not likely come from the loan itself. *See* 2015 IPO Remarks at 2 ("Where the petitioner obtains a loan from a lawful source (such as a reputable bank), the loan proceeds may, nevertheless, be unlawful if the capital was obtained by unlawful means (such as fraud on a loan application)."). And, notwithstanding the Court's decision, the burden of proof continues to remain with the petitioner to establish eligibility. *Matter of Brantigan*, 11 I. & N. Dec. 493, 493 (BIA 1966)("the burden of proof required of an applicant for United States citizenship never shifts"). Thus, an investor investing cash loan proceeds must still demonstrate that the proceeds were lawfully acquired.

### iii. USCIS' Interpretation is Not Supported by its Binding Precedent

Looking beyond the text, USCIS argues that agency precedent compels its interpretation. Defs.' MSJ & Opp'n, ECF No. 22 at 25-26. While "[a]rbitrary agency action becomes no less so by simple dint of repetition," *Judulang v. Holder*, 565 U.S. 42, 61 (2011), its arguments are nonetheless unpersuasive because the only case it discusses as support, *Matter of Soffici*, is readily distinguishable. Moreover, the Court finds that USCIS' binding precedent supports its decision.

In *Matter of Soffici*, the alien investor owned the commercial enterprise in which he invested. 22 I. & N. Dec. 158, 161-62 (BIA 1998). Like the plaintiffs, the investor attempted to invest third-party loan proceeds. *See id.* However, unlike the plaintiffs here, the investor obtained the third-party loan in the enterprise's name and secured the loan with the enterprise's assets. *Id.* at 162. In so doing, the alien investor attempted to, as USCIS puts it, "take credit" for the loan by arguing that he had invested cash into the enterprise. *See id.*; Defs.' MSJ & Opp'n, ECF No. 22 at 25-26. USCIS denied the alien investor's petition because the alien had not invested any capital at all; rather, he loaned the money to the enterprise, which took out the loan in its own name. *Soffici*, 22 I. & N. Dec. at 162. Moreover, the loan was secured by the enterprise's assets,

meaning that the alien investor did not invest new "capital" to create jobs. *Id.* In that regard, to the extent the alien investor invested any capital at all, he invested indebtedness because the investor was indebted to the enterprise itself. *See id.* ("even if it were assumed, arguendo, that the petitioner and [the enterprise] were the same legal entity for purposes of this proceeding, indebtedness that is secured by assets of the enterprise is specifically precluded from the definition of 'capital.'").

By contrast, plaintiffs here seek to invest cash obtained from third-party loans into new commercial enterprises. *See generally* Zhang A.R., ECF No. 27-4; Hagiwara A.R., ECF No. 27-1. The primary difference between this case and *Soffici* is that plaintiff-investors are not indebted to the enterprise, but to third-party lenders. *See id.* Unlike *Soffici*, the new commercial enterprises here received plaintiffs' "new" capital to create American jobs. *See id.* Unlike the enterprise in *Soffici*, which bore the risk of loss, here, the enterprises received cash and bear no risk of loss (as the loans were not collateralized by the enterprises' assets). *See id.*

Moreover, two other binding USCIS decisions support the Court's conclusion that investing "indebtedness," pursuant to 8 C.F.R. § 204.6(e), involves promising to pay the enterprise in the future via a promissory note. *See Matter of Izummi*, 22 I. &

38

N. Dec. 169 (BIA 1998)(finding that the alien investor invested indebtedness by promising to pay the enterprise in the future); *Matter of Hsiung*, 22 I. & N. Dec. 201, 201 (BIA 1998) ("A promissory note secured by assets owned by a petitioner can constitute capital under 8 C.F.R. § 204.6(e) if: the assets are specifically identified as securing the note; the security interests in the note are perfected in the jurisdiction in which the assets are located; and the assets are fully amenable to seizure by a U.S. note holder."). Such precedent is consistent with the Court's conclusion that an investor invests "indebtedness" when he or she is indebted to the enterprise itself. The special conditions imposed only on indebtedness also support this conclusion; because the asset actually contributed to the enterprise is merely a promise, the enterprise requires security in the form of personal collateralization. *See Hsiung,* 22 I. & N. Dec. at 202 n.1 ("[M]erely 'identifying' assets as securing a loan, without perfecting the security interest, is not meaningful since the note holder cannot be assured that the identified assets will remain available for seizure in the event of default."). This security interest is necessary to guarantee an actual investment in exchange for a visa preference. When the enterprise receives cash, however, no security interest is necessary.

USCIS does not dispute that *Matter of Hsiung* provides that a promissory note constitutes "indebtedness," so long as the note is personally collateralized. *See* Defs.' Reply, ECF No. 26 at 15-16. Instead, it contends that *Matter of Hsiung* does not limit its ability "to analyze indebtedness under *any other* EB-5 loan financing arrangement when interpreting the regulatory definition of capital." *Id.* at 15 (emphasis in original). However, USCIS' argument does not acknowledge that in *Matter of Hsiung*, USCIS used the term indebtedness to refer to financial arrangements between the alien investor and the commercial enterprise. *See* 22 I. & N. Dec. at 201-02. Here, USCIS uses the term indebtedness to refer to financial arrangements between the alien investor and an unrelated third party, allowing USCIS to inquire into the source of the invested cash (beyond whether the cash was lawfully acquired and that the cash was not derived from the enterprise itself). Such an interpretation runs contrary to *Matter of Hsiung* and the plain meaning of "capital."

### iv. The Context and History of the Regulation Further Undermine USCIS' Interpretation

"Language, of course, cannot be interpreted apart from context." *Smith v. United States*, 508 U.S. 223, 229 (1993). While the plain language of the regulation controls, the regulatory and statutory context and the history of the EB-5 Visa Program bolsters the Court's conclusion. *See Roberts v.*

*Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) ("It is a fundamental cannon of statutory construction that words in a statute must be read in their context and with a view to their place in the overall statutory scheme.").

As stated above, "indebtedness" only qualifies as "capital" if it is "secured by assets owned by the alien entrepreneur," for which the "alien entrepreneur is personally and primarily liable," and "the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness." 8 C.F.R. § 204.6(e). The requirement that capital be secured by assets owned by the investor applies only to "indebtedness" and only serves a purpose if the alien investor is indebted to the enterprise. *See Matter of Hsiung*, 22 I. & N. Dec. 201, 202 n.1 (BIA 1998) ("[M]erely 'identifying' assets as securing a loan, without perfecting the security interest, is not meaningful since the [enterprise] cannot be assured that the identified assets will remain available for seizure in the event of default."). These conditions ensure that the enterprise actually receives the investment, achieving the statutory goal of bringing new investments to the United States to create jobs. *See* S. Rep. No. 101-55, at 21 (1989). The interpretation serves no purpose when an alien investor has invested lawfully-acquired cash, regardless of how the investor obtained that cash, so long as the cash was not contributed in exchange for a debt from the

enterprise. As discussed, the enterprise is free to deploy the cash loan proceeds invested.

Thus, not only is USCIS' interpretation without a textual or structural basis, but it is also unmoored from the purposes animating the EB-5 Program itself. *See* 8 U.S.C. § 1153(b)(5). The EB-5 Program was intended to "create new employment for U.S. workers and to infuse new capital into the country." S. Rep. No. 101-55, at 21 (1989). Following the enactment of the statute, the INS originally proposed a definition of capital that did not include indebtedness. *See* Proposed Rule Employment-Based Immigrants, 56 Fed. Reg. 30703, 30713 (July 5, 1991). Indebtedness was added to the definition of capital when the agency promulgated its final rule. *See* Final Rule, 56 Fed. Reg. 60897, 60902 (Nov. 29, 1991). The agency explained that it intended to expand the definition of capital because "Congress intended the definition [of capital] to be broad." *Id.* Indeed, both parties agree that "indebtedness" was added to 8 C.F.R. § 204.6(e) in order to expand the assets that qualify as "capital." *See* Pls.' MSJ, ECF No. 19 at 36-37; Defs.' Reply, ECF No. 26 at 11 ("during the rulemaking process, the agency indicated that it made the definition of capital broad"). However, USCIS' interpretation narrows the assets that qualify as capital. In its view, "cash" only qualifies as "capital" if not derived from an uncollateralized, third-party loan. This

interpretation transforms the definition of "capital" from "capital means cash" (among other things) to "capital means cash not obtained from an uncollateralized, third-party loan." *See* 8 C.F.R. § 204.6(e).

With Congress' intent in mind, USCIS' interpretation is at odds with Congress' broad statutory purpose because it narrows the definition of capital. It may well be that USCIS has other policy reasons for not wanting to accept lawfully-obtained cash investments obtained from uncollateralized, third-party loans. Whatever those reasons may be, USCIS' interpretation is divorced from the language of its own regulation and the statutory purpose animating the EB-5 Program. As such, its interpretation is plainly erroneous, and its denials based on that interpretation are arbitrary and capricious.

**2. USCIS Violated the APA's Notice and Comment Requirement**

Plaintiffs also argue that USCIS' interpretation, as articulated in the 2015 IPO Remarks, violates the APA's notice and comment requirement. Pls.' MSJ, ECF No. 19 at 44-49. They contend that USCIS' interpretation is a "substantive" or "legislative" rule necessitating notice and comment procedures because it "carries the force of law" and is applied "with full force in every case in which a petitioner uses the cash proceeds of a loan as EB-5 investment capital." *Id.* at 45. As evidence, plaintiffs point to USCIS' instructions ordering adjudicators to

deny cases in which a petitioner invested cash loan proceeds unless that petitioner established that he or she is personally liable for the loan. *Id.* at 46-47.

USCIS argues that it did not violate the APA's notice and comment procedures, putting forward two arguments. Defs.' MSJ & Opp'n, ECF No. 22 at 30-34. First, USCIS argues that plaintiffs are time-barred from challenging the definition of "capital" as procedurally deficient because the regulation is over twenty-four years old, and the APA has a six-year statute of limitations. *Id.* at 31. Second, USCIS argues that its interpretation does not constitute a legislative rule requiring notice and comment. Instead, USCIS posits that the interpretation in the 2015 IPO remarks merely "clarified the agency's longstanding policy on how alien investors can satisfy the definition of 'capital' . . . when investing loan proceeds." *Id.* at 32. Because its interpretation "sensibly conforms to the words of a statute or existing legislative rule," USCIS contends that it did not establish a legislative rule requiring notice and comment. *Id.* at 33. As such, it did not violate the APA.

Plaintiffs respond that their claim is not time-barred because they do not challenge the existing regulation, as codified in 8 C.F.R. § 204.6(e). Pls.' Reply, ECF No. 24 at 39. Instead, plaintiffs challenge USCIS interpretation as announced in its 2015 IPO Remarks. Because plaintiffs filed suit within a

"few months" of the 2015 IPO Remarks, plaintiffs argue that their claim is timely. *Id.* Plaintiffs also contend that USCIS' interpretation is a legislative rule because it adopts a new position inconsistent with existing regulations. *Id.* at 40-41.

### a. Plaintiffs' Claims are Not Time-Barred

As an initial matter, the Court agrees that plaintiffs' APA claims are not barred by the applicable six-year statute of limitations. True, the APA provides a six-year window for plaintiffs to challenge agency rules, *see James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1094 (D.C. Cir. 1996) (recognizing the APA carries a six-year statute of limitations), but it is abundantly clear that plaintiffs challenge USCIS' interpretation of the regulation, not the underlying regulation itself. *See generally* Pls.' MSJ, ECF No. 19.

Indeed, plaintiffs do "no[t] dispute that the regulation defining 'capital' was promulgated only after notice published in the Federal Register and an opportunity for public comment." Pls.' Reply, ECF No. 24 at 39. Instead, they challenge USCIS' interpretation of that regulation as erroneous and violative of the APA. *See generally* Pls.' MSJ, ECF No. 19. Plaintiffs sued USCIS on June 23, 2015, *see* Compl., ECF No. 1, just two months after USCIS announced its interpretation on April 22, 2015, *see* 2015 IPO Remarks. As such, plaintiffs filed their APA claim well within the applicable six-year statute of limitations.

### b. USCIS' Interpretation is a Legislative Rule Subject to the APA's Notice and Comment Requirement

The APA requires federal agencies to publish "[g]eneral notice of proposed rulemaking" in the Federal Register, 5 U.S.C. § 553(b), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," 5 U.S.C. 553(c); *Air Transp. Ass'n of Am., Inc. v. F.A.A.*, 291 F.3d 49, 55 (D.C. Cir. 2002). Section 553, however, exempts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b). These exemptions are to be "narrowly construed and only reluctantly countenanced." *State of N. J., Dep't of Envtl. Prot. v. U.S. Envtl. Prot. Agency*, 626 F.2d 1038, 1045 (D.C. Cir. 1980). If an agency does not follow proper rule-making procedures when required, a court can "hold unlawful and set aside agency action, findings, and conclusions found to be ... without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

Determining whether a given agency action is interpretive or legislative is an "extraordinarily case-specific endeavor." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987). Indeed, the APA does not define "interpretive rule," and "its precise meaning is the source of much scholarly and judicial debate." *Perez v. Mortg. Bankers Ass'n*, 135 S.Ct. 1199,

1204 (2015); *see General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc) (describing the distinction as "enshrouded in considerable smog"). "The D.C. Circuit, however, has recognized a four-part test for determining if a rule is legislative or interpretive." *Texas Children's Hosp. v. Azar*, 315 F. Supp. 3d 322, 337 (D.D.C. 2018)(citing *Am. Mining Cong. v. Mine Safety and Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)). Whether "the purported interpretive rule has 'legal effect'" is determined by:

> (1) [W]hether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties; (2) whether the agency has published the rule in the Code of Federal Regulations; (3) whether the agency has explicitly invoked its general legislative authority; and (4) whether the rule effectively amends a prior legislative rule. If the answer to any of these questions is affirmative, we have a legislative rule.

*Am. Mining Cong.*, 995 F.2d at 1112. The court must make this determination itself; it cannot accept an agency's characterization of its own action: "it is well established that an agency may not label a substantive change to a rule an interpretation simply to avoid the notice and comment requirements." *Air Transp. Ass'n*, 291 F.3d at 55 (citing *Appalachian Power Co. v. EPA,* 208 F.3d 1015, 1024 (D.C. Cir. 2000)).

The second and third factors are not contested here: USCIS'
interpretation was not published in the Federal Register and
USCIS does not invoke its general rulemaking authority. *See*
*generally* Pls.' MSJ, ECF No. 19; Defs.' MSJ & Opp'n, ECF No. 22.
Evaluating the fourth factor, however, clearly suggests that
USCIS' interpretation is a legislative rule. "With respect to
the fourth factor, '[t]he practical question inherent in the
distinction between legislative and interpretive regulations is
whether the new rule effects a substantive regulatory change to
the statutory or regulatory regime.'" *Texas Children's Hosp.*,
315 F. Supp. 3d at 337 (quoting *Elec. Privacy Info. Ctr. v. U.S.*
*Dep't of Homeland Sec.*, 653 F.3d 1, 6–7 (D.C. Cir. 2011)). As
has been extensively discussed, *supra* Sec. III.A.1.c, the Court
finds that USCIS' interpretation was plainly erroneous because
it contradicted the plain meaning of the EB-5 regulation. By
requiring investors to personally collateralize loan proceeds
invested as cash, USCIS added an additional requirement to the
regulatory definition of "capital" not found within the text. In
so doing, USCIS impermissibly created "*de facto* another
regulation." *Christensen*, 529 U.S. at 588.

It is well-settled that a policy that adds a requirement
not found in the relevant regulation is a substantive rule that
is invalid unless promulgated after notice and comment. *See*
*Cent. Texas Tel. Co-op., Inc. v. F.C.C.*, 402 F.3d 205, 211 (D.C.

Cir. 2005) ("If a second rule repudiates or is irreconcilable with a prior legislative rule, the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative.")(citations and quotations omitted); *Air Transp. Ass'n*, 291 F.3d at 56 ("As the United States Supreme Court has noted, APA rulemaking is required if an interpretation 'adopt[s] a new position inconsistent with ... existing regulations.'")(quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995)); *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 236 (D.C. Cir. 1992)("[The agency] may not constructively rewrite the regulation, which was expressly based upon a specific interpretation of the statute, through internal memoranda or guidance directives that incorporate a totally different interpretation and effect a totally different result."); *Nebraska Dep't of Health & Human Servs. v. U.S. Dep't of Health & Human Servs.*, 340 F. Supp. 2d 1, 17 (D.D.C. 2004)("Changing the interpretation of a regulation requires a notice and comment period.")(citing *Paralyzed Veterans of America v. D.C. Arena*, 117 F.3d 579, 586 (D.C. Cir. 1997)). As an example, USCIS has recently proposed increasing the required capital contribution to qualify for an EB-5 visa, which would amend a requirement found in 8 C.F.R. § 204.6. Understanding that such a change would require notice and comment procedures,

USCIS proposed the amendment in the Federal Register. *See* Proposed Rule EB-5 Immigrant Investor Program Modernization, 82 Fed. Red. 4738 (Jan. 13, 2017).

Moreover, USCIS' interpretation creates a "binding norm that is finally determinative of the issues or rights to which it is addressed." *CropLife Am. V. EPA*, 329 F.3d 876, 881 (D.C. Cir. 2003)(citations and quotations omitted). To illustrate, about a month before issuing the IPO Remarks, USCIS issued instructions for adjudicators regarding "capital derived from indebtedness." *See* Hagiwara A.R., ECF No. 27-1 at 399-401; Zhang A.R., ECF No. 27-4 at 183-185. In the instructions, USCIS states that adjudicators "must" follow its interpretation by ensuring that the petitioner has established that he or she is personally and primarily liable for the loan when investing loan proceeds. *Id.* If the petitioner is unable to demonstrate eligibility under USCIS' interpretation, an adjudicator "will" deny the petition. *Id.* USCIS' instructions make clear that its interpretation carries the force of law: adjudicators are not free to exercise discretion and the interpretation is binding on all petitions. USCIS' choice of words is of "great[] importance," as the D.C. Circuit has "given decisive weight to the agency's choice between the words 'may' and 'will'" when determining whether an interpretation or policy is binding. *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537-38 (D.C. Cir. 1986). Indeed, it

is clear that USCIS' interpretation created a "binding norm that is finally determinative of the issues or rights to which it [was] addressed." *CropLife Am.*, 329 F.3d at 881; *see also Am. Bus Ass'n v. United States*, 627 F.2d 525, 529 (D.C. Cir. 1980) ("If it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits administration discretion, it will be taken for what it is, a ... rule of substantive law.")(quotations and citations omitted). As such, USCIS' interpretation is a legislative, substantive rule subject to notice and comment procedures. *See* 5 U.S.C. § 553(b),(c).

For the reasons exhaustively discussed, the Court cannot agree with USCIS that its interpretation is not a legislative rule because it "sensibly conforms to the words of a statute or existing legislative rule." Defs.' MSJ & Opp'n, ECF No. 22 at 33. Indeed, the Court has already found that USCIS' interpretation does *not* conform to the text of 8 C.F.R. § 204.6(e). Similarly, the Court does not find that USCIS' interpretation is merely a clarification of its long-standing policy. USCIS' interpretation may well be long-standing, but it is not a mere clarification of the governing regulation. The interpretation modifies the plain meaning of the EB-5 regulation, effectively amending the rule. As such, it is a legislative rule. *See Am. Mining Cong.*, 995 F.2d at 1109.

Because USCIS did not submit the non-exempt interpretation for notice and comment, USCIS violated the APA.

### 3. Remand is the Proper Remedy

Plaintiffs request that the Court approve their petitions outright. *See* Compl., ECF No. 1 at 27-28. The Court concludes that such a remedy is not appropriate: "[a]s the Supreme Court has instructed . . . where 'the record before the agency does not support the agency action, . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, (1985)). A reviewing court is "not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Florida Power*, 470 U.S. at 744. This is especially the case "in the field of immigration," where "there may be sensitive issues lurking that are beyond the ken of the court." *Fox v. Clinton*, 684 F.3d 67, 80 (D.C. Cir. 2012).

Therefore, the "course of prudence" is to remand the case to USCIS for reconsideration of the class members' petitions. *Id.* USCIS' decisions to deny the class members' petitions are therefore **VACATED** and the denials are **REMANDED** to USCIS for reconsideration consistent with this Memorandum Opinion.

**B. Motion for Class Certification**

Having determined that USCIS' interpretation of its regulation is erroneous and violates the APA, the Court must now evaluate plaintiffs' pending motion for class certification. Pls.' Class Cert. Mot., ECF No. 10. Plaintiffs seek certification of the following class:

> All Form I-526 petitioners who: (1) invested cash in a new commercial enterprise in an amount sufficient to qualify as an EB-5 investor; (2) obtained some or all of the cash invested in the new commercial enterprise through a loan; (3) filed a Form I-526 petition prior to April 22, 2015 based on that investment; and (4) received or will receive a denial of their I-526 petition on the ground that the loan used to obtain the invested cash fails the collateralization test described in the announcement made by USCIS during its April 22, 2015 EB-5 stakeholder engagement.

*Id.* at 1. Plaintiffs contend that the proposed class satisfies the requirements of Federal Rule of Civil Procedure 23 because the class members challenge the facial validity of USCIS' interpretation of the EB-5 regulation. *See generally id.* The class members all sought (or are seeking) to immigrate to the United States via the EB-5 program but were denied (or will be denied) for the same reason. *See id.*

USCIS opposes plaintiffs' motion for class certification, arguing that the proposed class lacks commonality and typicality and, as such, class counsel may not fairly and adequately represent all class members. *See* Defs.' Class Cert. Opp'n, ECF

No. 13 at 11-15. USCIS also argues that plaintiffs do not seek relief from an unlawful practice generally applicable to the entire class. *See id.* at 15-16. Having carefully considered the motions, the Court hereby **GRANTS** plaintiffs' motion for class certification, albeit with a slightly modified class definition, discussed below.

### 1. Standard of Review

Class certification is governed by Federal Rule of Civil Procedure 23 and proponents of the class action have the burden of proof as to each of its requirements. *See McCarthy v. Kleindienst*, 741 F.2d 1406, 1414, 1414 n.9 (D.C. Cir. 1984). First, the party seeking certification must demonstrate that the proposed class satisfies all four of the requirements listed in Rule 23(a). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Specifically, the party seeking certification must demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of . . . the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-mart*, 564 U.S. at 349. Its "four requirements—

numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Id.* (quotations and citations omitted).

Second, plaintiffs must demonstrate that the proposed class satisfies at least one of the three requirements listed in Rule 23(b). *See id*. at 345. Here, the plaintiffs argue the proposed class satisfies Rule 23(b)(2) because "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). In evaluating a class proposed under Rule 23(b)(2), the "key" inquiry is whether the "injunctive or declaratory remedy warranted" is of a "indivisible nature," "such that [the conduct] can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (quotations and citations omitted). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.*

### 2. The Class is Sufficiently Ascertainable

Although Rule 23 does not "specifically require plaintiffs to establish that a class exists, this is a common-sense requirement and courts routinely require it." *Pigford v.*

*Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998)(citing *Franklin v. Barry*, 909 F. Supp. 21, 30 (D.D.C. 1995); *Lewis v. Nat'l Football League*, 146 F.R.D. 5, 8 (D.D.C. 1992)). This "common-sense requirement" ensures that any class is "clearly defined [and] is designed primarily to help the trial court manage the class." *Id.* (citing *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994)). It is not designed to be a "particularly stringent test," but "plaintiffs must at least be able to establish that the general outlines of the membership of the class are determinable at the outset of the litigation" such that "it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* (quotations and citations omitted).

USCIS does not dispute that the plaintiffs have sufficiently established that a class exists or that the general outlines of membership are determinable. *See generally* Defs.' Class Cert. Opp'n, ECF No. 13 at 2, 9-17 (stating that the Court "should deny plaintiffs' motion for failure to identify an ascertainable class" but only arguing that the proposed class does not meet the Rule 23(a) and (b)(2) requirements). Regardless, the Court finds that the plaintiffs' proposed class is based on objective criteria that can be easily determined. *See Thorpe v. District of Columbia*, 303 F.R.D. 120, 140 (D.D.C. 2014)(finding that the proposed class was ascertainable because

the definitions were "fairly specific" and not "vague"). As such, the proposed class is ascertainable and well-defined: "by looking at the class definition, counsel and putative class members can easily ascertain whether they are members of the class." *Pigford*, 182 F.R.D. at 346.

Indeed, plaintiffs' class is readily ascertainable to both class members and counsel. As discussed above, when USCIS denies an I-526 petition, it issues written notice with the agency's reasons for denying the petition. *See* 8 C.F.R. § 204.6(k)("the petitioner will be notified of the decision, and, if the petition is denied, of the reasons for the denial"); Hagiwara A.R., ECF No. 27-1 at 392-397 (Notice of Decision); Zhang A.R., ECF No. 27-4 at 177-181 (Notice of Decision). Therefore, to determine whether an individual meets the class definition, one need only read the Notice of Decision (or the preceding Request for Evidence, *see e.g.*, Hagiwara A.R., ECF No. 27-1 at 245-250). If the investor filed an I-526 petition that was denied solely based on USCIS' erroneous interpretation that cash loan proceeds are invested as indebtedness, the investor is a member of the class.

### 3. The Class is Sufficiently Numerous

The Court finds, and USCIS does not dispute, that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a); *see generally* Defs.'

Class Cert. Opp'n, ECF No. 13. The numerosity requirement is determined on a case-by-case basis and "imposes no absolute limitations". *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 180 (D.D.C. 2015)(citations omitted). As such, plaintiffs "need not prove exactly how many people fall within the class to merit certification." *Id.* (citing *Kifafi v. Hilton Hotels Retirement Plan*, 189 F.R.D. 174, 176 (D.D.C.1999) ("So long as there is a reasonable basis for the estimate provided, the numerosity requirement can be satisfied without precise numbers.")). Generally speaking, "courts have found that a proposed class consisting of at least forty members" satisfies Rule 23(a)'s numerosity requirement. *Johnson v. District of Columbia*, 248 F.R.D. 46, 52 (D.D.C.2008).

Plaintiffs have provided a reasonable basis to assume there are at least 134 EB-5 investors whose I-526 petitions have been or will be denied based on USCIS' erroneous interpretation of its regulation that loan proceeds are invested as "indebtedness" and not "cash." *See* Peter D. Joseph Decl., ECF No. 10-6 (reporting that at least 134 investors from seven Regional Centers received a Request for Evidence, Notice of Intent to Deny, or Notice of Decision based on USCIS' erroneous interpretation). As such, the Court agrees that plaintiffs have established the numerosity requirement.

#### 4. There are Questions of Law Common to the Entire Class and Claims Typical to the Entire Class

Plaintiffs argue that there are questions of law or fact common to the class and the representatives' claims are typical of the class—as Rule 23(a)(2) and (3) require—because the plaintiffs challenge USCIS' "uniform policy or practice," which affected or will affect each member. Pls.' Class Cert. Mot., ECF No. 10 at 20-23. Because the class definition requires that the investor's I-526 petition has been denied (or will be denied) based on USCIS' erroneous interpretation, the Court's decision resolves the issue central to each class member's claim. *See id.* USCIS argues that plaintiffs have not established commonality and typicality because the putative class is too broadly drawn, "bringing within its ambit differing factual circumstances and differing legal claims." Defs.' Class Cert. Opp'n, ECF No. 13 at 11; *see id.* 11-14. It contends that the proposed class includes "groups of aliens whose legal and factual interests differ" because there are "different factual basis for their claims." *Id.* at 11. USCIS points to the "different loan agreements at issue in these various investment projects," *id.* at 13, and argues that the definition impermissibly "treats[] all debt, regardless of structure, the same," *id.* at 12.

"The commonality and typicality requirements often overlap because both serve as guideposts to determine whether a class

action is practical and whether the representative plaintiffs' claims are sufficiently interrelated with the class claims to protect absent class members." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 181 (D.D.C. 2015)(quotations and citations omitted). Because USCIS' principal challenge to class certification goes to both, the Court considers them together.

To establish commonality, plaintiffs must demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To that end, class members' claims must depend on a "common contention [that] . . . is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. In other words, the representative plaintiffs must show that the class members have "suffered the same injury." *Id.* (quotations omitted). Indeed, commonality is satisfied when plaintiffs challenge "a uniform policy or practice that affects all class members." *DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013). To demonstrate typicality, plaintiffs must establish that the class representatives' claims or defenses are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality means that the representative plaintiffs must 'possess the same interest and suffer the same

injury' as the other class members." *R.I.L-R*, 80 F. Supp. 3d at 181 (quoting *Falcon*, 457 U.S. at 156).

Here, it is clear that all members of the class "suffered the same injury" or will suffer the same injury: denial of their I-526 petition based on USCIS' erroneous interpretation of 8 C.F.R. § 204.6 that cash loan proceeds are invested as "indebtedness" and therefore must be personally collateralized. *Walmart*, 564 U.S. at 350. Indeed, the challenged interpretation, as announced in USCIS' 2015 IPO Remarks, is a "uniform policy or practice . . . [that] affects all class members." *R.I.L-R*, 80 F. Supp. 3d at 181 (quoting *DL*, 713 F.3d at 128). By terms of the approved and modified class definition, USCIS' erroneous interpretation must be the sole basis for every class member's existing or forthcoming I-526 petition denial. This common injury is "capable of classwide resolution" because the Court's decision resolves "each one of the claims in one stroke"—it vacates and remands USCIS' denials. *Walmart*, 564 U.S. at 350*.*

Petition-specific factual differences among class members would not defeat commonality or typicality. Indeed, "demonstrating typicality does not mean showing that there are no factual variations between the claims of the plaintiffs." *Bynum v. District of Columbia*, 214 F.R.D. 27, 35 (D.D.C. 2003). Here, the Court concludes that the named plaintiffs' claims are "based on the same legal theory as the claims of the other class

members," namely that USCIS' interpretation of 8 C.F.R. § 204.6 is erroneous and violates the APA. *Id.* As such, the typicality requirement is satisfied as "the named plaintiffs' injuries"— petition denials based on the erroneous interpretation—"arise from the same course of conduct that gives rise to the other class members' claims." *Id.*

The Court is not persuaded by USCIS' arguments to the contrary. For example, USCIS points to the "different loan agreements at issue" and argues that plaintiffs' "overbroad" definition lacks commonality and typicality because "the structure of the third party loan invariably affects [USCIS'] determination." Defs.' Class Cert. Opp'n, ECF No. 13 at 12-13. But plaintiffs do not challenge USCIS' interpretation as erroneously applied in different circumstances. Instead, plaintiffs' challenge the facial validity of USCIS' interpretation that cash loan proceeds are invested as indebtedness. *See generally* Pls.' MSJ, ECF No. 19. By invalidating USCIS' interpretation and vacating its denials based on that interpretation, the Court's decision resolves all class members' claims, as all class members received or will receive denials solely based on USCIS' erroneous interpretation. Indeed, because USCIS' interpretation is erroneous, the Court disagrees that class certification "would quickly devolve into hundreds of individualized inquiries about each plaintiff's

particular circumstances," as USCIS contends. Defs.' Class Cert. Opp'n, ECF No. 13 at 13-14.

Finally, the Court rejects USCIS' suggestion that commonality and typicality cannot be satisfied because the proposed class is "not limited in geographic scope." *Id.* at 12. "Nothing in Rule 23 . . . limits the geographical scope of a class action that is brought in conformity with that Rule." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Instead, a court must "take care to ensure that nationwide relief is indeed appropriate in the case before it" to avoid "improperly interfer[ing] with the litigation of similar issues in other judicial districts." *Id.* The Court has done so here. Plaintiffs challenge a federal agency's interpretation of its rule established in the course of implementing a federal immigration program. Any geographic limitation of the class would be entirely arbitrary. *See id.* at 702-03 (affirming certification of a nationwide class challenging the administration of a federal program). Moreover, USCIS has not identified any ongoing litigation regarding the same issue in other districts. *See generally* Defs.' Class Cert. Opp'n, ECF No. 13. As such, there is no reason to believe that certifying a nationwide class would foreclose adjudication by other courts.

**5. The Representative Plaintiffs and Counsel Will Fairly and Adequately Protect the Interests of the Class**

Plaintiffs argue that the representative parties will fairly and adequately protect the interests of the class because there is no conflict between the named plaintiffs and the rest of the class and counsel is competent to represent the class. Pls.' Class Cert. Mot., ECF No. 10 at 24. USCIS does not dispute that counsel is competent to represent the class, but instead argues that the class representatives cannot fairly represent the class because their "legal and factual circumstances . . . are so distinct from the proposed class." Defs.' Class Cert. Opp'n, ECF No. 13 at 14. Specifically, USCIS points to the fact that the named plaintiffs obtained loans from businesses they principally owned. *Id.* at 14-15.

As discussed, the class members all suffered or will suffer the same injury: denial of their I-526 petitions based on USCIS' erroneous interpretation of its regulation. As such, the representative members' interests are aligned with the rest of the class. The Court again rejects USCIS' argument that plaintiffs have conflicting interests based on their specific loan arrangements because plaintiffs do not challenge any particular application of USCIS' interpretation. Instead, plaintiffs challenge USCIS' interpretation of its regulation generally.

Finally, the Court finds that class counsel is more than competent to represent the class. *See, e.g.*, Kurzban Decl., ECF No. 10-7. Counsel has decades of experience with both immigration litigation and class actions. *See generally id.* Based on the briefing in this case, counsel clearly devoted substantial time and efforts to this litigation and will continue to zealously represent all class members.

### 6. USCIS' Erroneous Interpretation Applies Generally

Plaintiffs argue that they have established that USCIS "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole" pursuant to Rule 23(b)(2). Plaintiffs contend that all of the class members' I-526 petitions have been or will be denied for the same reason. Pls.' Class Cert. Mot., ECF No. 10 at 24-25. USCIS argues that plaintiffs do not seek relief from a generally applicable unlawful practice because USCIS' interpretation of its regulation is not a "new eligibility rule." Defs.' Class Cert. Opp'n, ECF No. 13 at 15. Instead, USCIS contends that its interpretation is "longstanding," and therefore plaintiffs "have not shown that injunctive or declaratory relief is appropriate." *Id.* at 15-16.

Plaintiffs' proposed class satisfies Rule 23(b)(2) because USCIS' interpretation of its regulation has been or will be

applied generally to the entire class and plaintiffs seek declaratory and injunctive relief that will benefit the class as a whole. As in *R.I.L-R v. Johnson*, plaintiffs' "suit challenges a policy generally applicable to all class members." 80 F. Supp. 3d at 182. As has been discussed, "a determination of whether that policy is unlawful would resolve all class members' claims 'in one stroke.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 350).

USCIS' arguments to the contrary are devoid of merit. Even assuming USCIS' interpretation is "longstanding" and is not a "new eligibility rule," it does not follow that certification is inappropriate. First, the Court has indeed determined that USCIS' interpretation is a legislative rule subject to the APA's notice and comment procedures, lending support to the argument that its interpretation is a formal "policy." *See supra* Sec. III.A.2. Second, "courts have never required [class certification under 23(b)(2)] to turn on whether the party opposing the class has adopted . . . a formal policy. Rather, it is enough to show that a defendant 'has acted in a consistent manner toward members of the class so that his actions may be viewed as part of a pattern of activity.'" *Bynum*, 214 F.R.D. at 37 (quoting 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1775 (2d ed. 1986)). Indeed, USCIS cannot dispute that its purportedly "longstanding"

interpretation is being applied consistently and to the detriment of the proposed class.

### 7. Court Modification of the Class Definition

Accordingly, the Court finds that plaintiffs have established that a class action is appropriate pursuant to Federal Rule of Civil Procedure 23. As such, the Court **GRANTS** plaintiffs' motion for class certification, albeit with two modifications to the class definition.

First, plaintiffs limit the proposed class to all investors who "filed a Form I-526 petition prior to April 22, 2015." Pls.' Class Cert. Mot., ECF No. 10 at 1. Plaintiffs propose defining the class in this manner so "all proposed class members would benefit if the Court determines that the collateralization rule cannot be applied retroactively (Count II)." *Id.* at 22. The date is significant because USCIS publicly announced its erroneous interpretation on April 22, 2015 and plaintiffs argue that USCIS retroactively applied its interpretation to investors who applied for an EB-5 visa prior to that announcement. *See id.* at 12-14. However, the Court ultimately does not reach plaintiffs' retroactivity claim because it concludes that USCIS' interpretation is plainly erroneous and violates the APA.[10]

---

[10] Plaintiffs agree that the retroactivity analysis need not be reached if the Court finds that the interpretation is arbitrary and capricious. *See* Pls.' MSJ, ECF No. 19 at 51 ("Indeed, the retroactivity analysis starts with the assumption that the

Therefore, because *any* denial based on USCIS' interpretation is erroneous, the date limitation strikes the Court as unduly arbitrary.

Second, the Court amends the definition to clarify that only investors who received a denial of their I-526 petition *solely* based on the USCIS' interpretation are included in the class. The class does not include investors who received denials for multiple reasons. As such, the Court certifies the following class:

> All Form I-526 petitioners who: (1) invested cash in a new commercial enterprise in an amount sufficient to qualify as an EB-5 investor; (2) obtained some or all of the cash invested in the new commercial enterprise through a loan; (3) filed a Form I-526 petition based on that investment; and (4) received or will receive a denial of their I-526 petition *solely* on the ground that the loan used to obtain the invested cash fails the collateralization test described in the USCIS 2015 IPO Remarks announcement.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** plaintiffs' motion for summary judgment; **DENIES** USCIS' cross-motion for summary judgment; **GRANTS** plaintiffs' motion to

---

policy or interpretation at issue is *not* arbitrary and capricious. If a rule is arbitrary and capricious, the issue of retroactivity is moot because the rule cannot be applied prospectively, much less retroactively."). Thus, plaintiffs' proposed temporal limitation serves no purpose.

certify class, albeit with a modified class definition; and

**DENIES AS MOOT** plaintiffs' motion to amend the complaint. USCIS'

decisions to deny plaintiffs' and class members' petitions are

therefore **VACATED** and the denials are **REMANDED** to USCIS for

reconsideration consistent with this Memorandum Opinion. The

Clerk of Court is directed to close this case, with such closure

being without prejudice to a motion to re-open following further

USCIS proceedings. An appropriate Order accompanies this

Memorandum Opinion.

     **SO ORDERED.**

**Signed:**     **Emmet G. Sullivan**
           **United States District Judge**
           **November 30, 2018**